IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

KSENIIA PETROVA

No. 1:25-cr-10272-LTS

LEAVE TO FILE EXCESS PAGES
GRANTED DECEMBER 16, 2025
ECF# 41

## DEFENDANT KSENIIA PETROVA'S MOTION TO COMPEL DISCOVERY AND INCORPORATED MEMORANDUM IN SUPPORT

Defendant, Kseniia Petrova, requests an order compelling the government to produce discovery, as requested by letter dated September 12, 2025. *See* Ex. A. In its response, the government declined to provide much of the requested material. *See* Ex. B. The Court should order production pursuant to Fed. R. Crim. P. 16, Local Rule 16.2, the Due Process Clause of the Fifth Amendment, *Brady v. Maryland*, 373 U.S. 83 (1963), and the inherent power of the Court to order appropriate discovery. *See* Fed. R. Crim. P. 16, Advisory Committee Notes (recognizing that "[t]he rule is intended to prescribe the *minimum* amount of discovery to which the parties are entitled…[and] is *not intended to limit the judge's discretion to order broader discovery* in appropriate cases") (emphasis added).

Ms. Petrova, a 30-year-old Russian national and bioinformatics researcher at Harvard Medical School, arrived at Logan Airport on February 16, 2025, after traveling in Europe. When Customs and Border Protection ("CBP") officials discovered research samples in her luggage — comprised of inert (non-living) formalin-fixed embryonic frog cells — CBP unlawfully cancelled her visa, purported to find her inadmissible, and sent her into a months-long ordeal of cross-country detention. She filed a habeas petition in the District of Vermont (the "habeas court") against the

1

Department of Homeland Security ("DHS") and other respondents challenging her immigration detention. Her unlawful detention and related litigation attracted international media attention. Months later, as she achieved incremental success in her habeas case and appeared likely to be released on bond, federal prosecutors brought the instant criminal case against her.

The habeas court found that Ms. Petrova "plausibly alleges that the CBP officer acted contrary to applicable law and the statutory mandate of the INA[,] . . . that *her criminal proceedings were initiated for an improper purpose*, and that she was thereby deprived of . . . due process." *Petrova v. U.S. Dept. Homeland Security et al*., No. 25-cv-00240, ECF# 95 at 43 (D. Vt. Sept. 26, 2025) (emphasis added) (Order on DHS's Motion to Dismiss; subsequent references to other habeas court docket entries are listed as "D.Vt. ECF#___"). The requested discovery is material to the elements of the three substantive criminal charges, as well as anticipated pre-trial challenges to these criminal proceedings which are unconstitutionally selective, vindictive, and contrary to due process.

## **BACKGROUND**

### A.     **Ms. Petrova's Arrival at Logan Airport, Detention, and the Habeas Proceedings**

The habeas court summarized the background facts leading up to and through Ms. Petrova's arrival at Logan Airport on February 16, 2025:

> Ms. Petrova is a research scientist who is a citizen of Russia and who resides in Boston, Massachusetts. . . . [S]he was employed by Harvard University where she was "conducting groundbreaking scientific research at Harvard University in the fields of embryology and the biology of aging," which "is essential for understanding how cells and organisms develop, grow, and age, and how these processes go awry in diseases, including cancers." According to Harvard University, she "brings important skills and talents to our country that enrich our labs, spark innovation, and advance research and development."
>
> On May 11, 2023, Ms. Petrova [came to] the United States with a valid J-1 visa and has since traveled to and from the United States without violating the terms or conditions of her visa or nonimmigrant status. A J-1 visa "is a non-immigrant visa

that allows people to participate in exchange visitor programs in the United States" and is often held by noncitizen research scholars and professors.

On or about January 23, 2025, Ms. Petrova traveled to Europe for a vacation. Before she returned from her trip, Dr. Leon Peshkin, her supervisor at Harvard University, "asked her to bring histological[sic] samples of frog embryos from his scientific collaborators at the *Institut Curie* in France back to Harvard, so that their lab could continue processing and analyzing data from [the samples]." "The samples were non-hazardous, noninfectious, non-toxic, intended solely for fundamental research purposes." Ms. Petrova alleges that "under applicable customs laws and regulations, the embryos were not classified as prohibited items and did not require a permit for importation into the United States." Dr. Peshkin asked Ms. Petrova to bring them in person rather than have the samples shipped because of his previous experiences with sample shipments being delayed or lost in transit. Ms. Petrova had no prior experience transporting research samples and "was unfamiliar with U.S. customs requirements regarding" them.

When attempting to reenter the United States at [Logan Airport] on February 16, 2025, Ms. Petrova carried the samples in her luggage and did not declare them to U.S. customs. At the airport, Ms. Petrova presented her valid J-1 visa to the inspecting CBP officer and received a J-1 admission stamp indicating that she was admitted to the United States as a J-1 visa holder. At approximately the same time, the CBP officer generated an I-94 Record of Admission. At the baggage carousel, [a K9 alerted to food in Ms. Petrova's bag.] [A]nother CBP officer approached her and escorted her to a room to question her and examine her luggage. At some point, CBP searched Ms. Petrova's cellphone . . . .

A secondary inspection was conducted, additional customs-related questions were posed, and a CBP officer declared Ms. Petrova "inadmissible pursuant to INA 212(a)(7)(A)(i)(l) as an immigrant without a valid and unexpired immigrant document," and marked Ms. Petrova's J-1 visa in her passport "CANCELLED-BOS." . . . .

D.Vt. ECF# 95 at 2-7 (emphasis added) (internal citations omitted). CBP then commenced paperwork to issue Ms. Petrova an expedited removal order. *Id.* at 6-8. CBP stated it would seek to return Ms. Petrova to Russia, but she stated she was afraid to be sent back to Russia because of her public opposition to Russia's war in Ukraine. *See id.* at 6-7. CBP denied her request to be sent back to Paris, from where she had come, and detained her at Logan airport.

On February 17, 2024, Ms. Petrova was transported to the Chittenden Regional Correctional Facility in South Burlington, Vermont. She was denied a bond hearing, denied release

via parole, and never provided a credible fear interview as required by 8 U.S.C. § 1225(b)(1)(A)(ii), even though that was the ostensible reason for her detention. *See* D.Vt. ECF# 95 at 7.

On February 23, 2025, Ms. Petrova filed a habeas petition in the District of Vermont, arguing CBP's visa cancellation, spontaneous inadmissibility finding, and her detention, were "blatantly unlawful." D.Vt. ECF# 59-1 at 3.

The next day, DHS transferred Ms. Petrova to the Richwood Correctional Center in Monroe, Louisiana. *See* D.Vt. ECF# 63 at 2-3; D.Vt. ECF# 95 at 80.

On April 22, 2025, the habeas court scheduled a hearing to take place on May 14, 2025, concerning her petition and complaint for declaratory and injunctive relief. *See* D.Vt. ECF# 36.

Before that hearing, on May 2, 2025, HSI national headquarters made a referral to initiate a criminal investigatoin of Ms. Petrova. *See* Ex. D (June 18, 2025 Probable Cause Hearing Transcript) at 37.

On May 12, 2025, the Commonwealth of Massachusetts filed an amicus brief in Ms. Petrova's habeas case, stating:

> The Trump Administration has demonstrated a policy and practice of targeting international students and academics in Massachusetts for visa revocation and detention for nonexistent or minor offenses that are not grounds for inadmissibility. This punitive approach, which strips noncitizen students and academics of their lawful immigration status and prevents them from completing their studies, threatens the Commonwealth's academic institutions, economic prosperity, and global leadership in education and scientific innovation. . . .
>
> Due to the federal respondents' unlawful actions, Ms. Petrova—a respected and valued Massachusetts resident and member of the Harvard community—is now stuck in a nightmare of a situation: her visa was cancelled unlawfully, she was denied admission to the United States based on the unlawful cancellation of that visa, and she is incarcerated in Louisiana seemingly indefinitely based on an expedited removal order that was never signed. This situation is unjustifiable and unlawful.

> Sadly, however, Ms. Petrova's situation is not unique. This case is just one example of the Trump Administration's policy of wielding immigration enforcement against students and academics as punishment for non-existent or minor offenses that should not incur immigration consequences. For example, Secretary of State Marco Rubio confirmed that "[w]henever the government catches non-U.S. citizens breaking our laws, we will take action to revoke their status." This policy "extends to the thousands of foreign students studying in the United States who abuse our hospitality." The position of the Trump Administration is that even visa-holders who "otherwise abused our hospitality" but did not break any laws would find "their visas are instantly revoked."

D.Vt. ECF# 43-1 at 3, 7 (citations omitted).

Meanwhile, Ms. Petrova's case garnered international media attention. On May 13, 2025, the *New York Times* published an Op/Ed by Ms. Petrova, herself, which described her scientific research as well as her ordeal in immigration detention.[1] The government has closely tracked this media attention. *See* Ex. C (BO07WE25BO0001-003 at 8-9) (HSI Report describing "much media attention to Petrova's immigration detention," including the "Opinion article authored by Petrova in the New York Times").

On May 14, 2025, the habeas court held the scheduled motion hearing. Among other things, the habeas court queried the government "whether or not this is in fact a biological specimen," or whether it was more akin to "a scorpion encased in plastic" that a person might bring home from a visit to Mexico.  D.Vt. ECF# 64 at 7 (May 14, 2025 Transcript). The habeas court scheduled a bail hearing for Ms. Petrova on May 28, 2025, noting that given her continued detention, time was "of the essence." *Id*. at 44.

**B.    The Criminal Charges**

Mere hours after the May 14 hearing in the habeas proceeding—but nearly three months after the February 16, 2025 incident at Logan Airport—the government unsealed criminal charges

---

[1]    *Available    at*    https://www.nytimes.com/2025/05/13/opinion/ice-detention-russian-scientist.html.

and transferred Ms. Petrova to the custody of the U.S. Marshals. By complaint, the government charged Ms. Petrova with one count of smuggling "merchandise" into the United States, in violation of 18 U.S.C. § 545, alleging that the frog embryos were "biological materials" that were required to be declared. *See* Cmplt. Aff., ECF# 2-2, ¶¶ 5, 14. The government requested that she be detained on the criminal charges.

Also on May 14, 2025, after the charges were unsealed, the United States Attorney for the District of Massachusetts posted a video on the social media platform "X," stating:

> Kseniia Petrova, a Russian national, allegedly smuggled clawed frog embryos and embryonic samples into the U.S. from overseas and then repeatedly lied to Customs and Border officials about having biological material in her baggage. These biological samples were allegedly being brought into the country illegally.
>
> The rule of law does not have a carveout for educated individuals with a pedigree. The U.S. visa that Ms. Petrova was given – which was revoked by customs officials, as a result of her conduct – is a privilege, not a right.
>
> Ms. Petrova's alleged lies and disregard for the health and safety of others have resulted in her arrest today on criminal charges.
>
> It is unfortunate that the New York Times allowed her alleged lies to be perpetuated with Ms. Petrova's guest essay, another instance of the media not allowing the facts to get in the way of a good story.

https://x.com/DMAnews1/status/1922765637815849015.

On May 25, 2025, DHS argued to the habeas court that the institution of criminal charges mooted the habeas petition. *See* D.Vt. ECF# 63 at 5.

On May 28, 2025, the habeas court held the scheduled bail hearing and ordered Ms. Petrova released from immigration custody. *See* D.Vt. ECF# 70.

Ms. Petrova was transferred to this District and appeared for a detention hearing before this Court on June 12, 2025, when she was released on pre-trial conditions. *See* ECF# 14-15.

On June 18, 2025, this Court held a probable cause hearing, where an HSI special agent, Brian Goldsworthy, testified for the government. Notably, despite his decades of experience, Goldsworthy was unable define "biological materials" or "merchandise" or explain what would qualify as such items for purposes of the customs laws. Ex. D at 38-49. Goldsworthy was also unable to explain any limitations or exceptions to the purported regulatory requirement that travelers declare every "article" brought into the United States. *Id.* at 49-50.

Around the time of the detention hearing, the government proposed that it would resolve the case pursuant to a Deferred Prosecution Agreement if Ms. Petrova would withdraw her requests for immigration relief, depart the United States, and not apply for re-admission for a period of 5 years. On June 24, 2025, the deadline set by the government, Ms. Petrova declined the government's proposal.

On June 25, 2025, the government obtained a three-count Indictment charging Ms. Petrova with concealing a material fact—her importation of frog embryos—in violation of 18 U.S.C. §1001(a)(1); making a false statement to a CBP Agricultural Specialist—denying that she had "biological materials"—in violation of 18 U.S.C. § 1001(a)(2); and smuggling "merchandise"—the scientific samples—into the United States, in violation of 18 U.S.C. § 545. ECF# 19.

Ms. Petrova has pleaded not guilty to all charges and intends to vigorously defend the case.

## ARGUMENT

This Court should order the government to produce all of the materials that it has withheld from Ms. Petrova or otherwise declined to locate or obtain.

## I.    Legal Principles Governing Discovery

### A.    The Government Must Produce Material Information.

The criminal discovery rules provide that

> [u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>> (i) *the item is material to preparing the defense*;
>> (ii) the government intends to use the item in its case-in-chief at trial; or
>> (iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E) (emphasis added); *see also* L.R. 116.1(c)(1)(A) (requiring production of Rule 16 material within 28 days of arraignment).

Materiality in this context is a low threshold: "[i]nformation is material even if it simply causes a defendant to completely abandon a planned defense and take an entirely different path." *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013); *see also United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013) ("Even if the documents caused [the defendant] to completely abandon [an] entrapment defense and take an entirely different path, the documents would still have been 'material to preparing the defense' under Rule 16(a)(1)(E)(i)."). The First Circuit has observed that

> Rule 16's mandatory discovery provisions were designed to contribute to the fair and efficient administration of justice by providing the defendant with sufficient information upon which to base an informed plea and litigation strategy; by facilitating the raising of objections to admissibility prior to trial; by minimizing the undesirable effect of surprise at trial; and by contributing to the accuracy of the fact-finding process.

*United States v. Lanoue*, 71 F.3d 966, 976 (1st Cir. 1995), *abrogated on other grounds by United States v. Watts*, 519 U.S. 148 (1997).

Indeed, even *in*culpatory information is subject to disclosure as material because "it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths." *United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998); *see also United States v. Facteau*, No 15-cr-10076-ADB, 2015 U.S. Dist. LEXIS 146210 at *2 (D. Mass. Oct. 28, 2015) (quoting *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005)).

### B.    The Government Must Produce Exculpatory Information

Independent of the criminal discovery rules, the government has a constitutional "duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." *United States v. Prochilo,* 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady v. Maryland,* 373 U.S. 83 (1963)). In describing the broad scope of this duty, the Local Rules elaborate that

> [e]xculpatory information includes, <u>but may not be limited to,</u> all information that is material and favorable to the accused because it tends to:
> (1) Cast doubt on defendant's guilt as to any essential element in any count of the indictment or information;
> (2) Cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief, that might be subject to a motion to suppress or exclude . . . .;
> (3) Cast doubt on the credibility or accuracy of any evidence that the government anticipates offering in its case-in-chief; or
> (4) Diminish the degree of the defendant's culpability or the defendant's Offense Level under the United States Sentencing Guidelines.

L.R. 116.2(a) (emphasis added).

A "trial prosecutor's speculative prediction about the likely materiality of favorable evidence . . . should not limit the disclosure of such evidence, because it is just too difficult to analyze before trial whether particular evidence ultimately will prove to be 'material' after trial." *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013). As another court elaborated:

> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of "materiality" discussed in *Strickler* and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase.

*Safavian,* 233 F.R.D. at 16.

**C.    The Government Must Produce Information Material to a Claim of Vindictive or Selective Prosecution**

Ms. Petrova anticipates filing a motion to dismiss on the basis this unprecedent prosecution against her is unconstitutionally selective and/or vindictive.  She is entitled to discovery in support of those planned motions based on the record already available, including the habeas court's finding that Ms. Petrova has plausibly alleged that "her criminal proceedings were initiated for an improper purpose." D.Vt. ECF# 95 at 43.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *North Carolina v. Pearce*, 395 U.S. 711, 738 (1969)); *see Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional'"); *see also Blackledge v. Perry*, 417 U.S. 21 (1974). To establish a constitutional claim for vindictive prosecution, a defendant must either (1) "produc[e] evidence of actual vindictiveness" or (2) "demonstrat[e] circumstances that reveal a sufficient likelihood of vindictiveness to warrant a presumption of vindictiveness." *United States v. Jenkins*, 537 F.3d 1, 3 (1st Cir. 2008).

Discovery in support of a vindictive prosecution claim is warranted where a defendant makes even a "*prima facie* showing of a realistic likelihood of vindictiveness." *United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir. 1989) (upon a *prima facie* showing, "it is incumbent upon the district court to conduct an evidentiary hearing where the government's explanations can be formally presented and tested"); *see also United States v. Heidecke,* 900 F.2d 1155, 1159 (7th Cir. 1990) ("Requiring the defendant to prove more than a colorable claim before compelling discovery might prematurely stifle a legitimate defense of vindictive prosecution for lack of evidence"). To

assess the likelihood of vindictiveness, courts weigh two factors: "(1) the prosecutor's 'stake' in preventing assertion of the protected right and (2) the reasonableness of the prosecutor's actions." *United States v. Garcia*, No. 3:25-cr-00115, 2025 U.S. Dist. LEXIS 196330, at *3 (M.D. Tenn. Oct. 3, 2025) (quoting *United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023) and *United States v. Poole*, 407 F.3d 767, 776 (6th Cir. 2005)).

Meanwhile, an unconstitutionally *selective* enforcement or prosecution occurs when a decision to investigate or prosecute is based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 488, 456 (1962); *see Armstrong v. United States*, 517 U.S. 456, 464-65 (1996) (when "the administration of a criminal law is 'directed so exclusively against a particular class of persons,'" such a "system of prosecution amounts to 'a practical denial' of the equal protection") (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)). An accused may establish a claim of selective enforcement or prosecution by producing evidence of discriminatory intent by the law enforcement agency or prosecutor and discriminatory impact. *See United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017); *United States v. Tuitt,* 68 F. Supp. 2d 4, 10 (D. Mass. 1999).

To warrant discovery related to selective prosecution, the defense must come forward with "some evidence tending to show the existence of the essential elements" of the claim. *Armstrong,* 517 U.S. at 468; *accord United States v. Schmucker,* 815 F.2d 413, 418 (6th Cir. 1987).

In this case, "the totality of events creates a sufficient evidentiary basis to conclude that there is a 'realistic likelihood of vindictiveness' [and selectivity] that entitles [Ms. Petrova] to discovery." *Garcia*, 2025 U.S. Dist. LEXIS 196330, at *2. Numerous irregularities have characterized this case from the start and undermine any presumption of regularity which the

government might otherwise have been owed.[2] "[T]he government's actions in this case—whether purposeful, reckless, or negligent—raise genuine issues of misconduct . . . and deserve to be fully explored by the defense." *United States v. Comey*, No. 1:25-cr-272-MSN-WEF, 2025 U.S. Dist. LEXIS 226131, at *33 (E.D. Va. Nov. 17, 2025).

> 1.    **Ms. Petrova has made a strong preliminary showing that the government conducted a criminal investigation and then brought the pending prosecution in an unconstitutional effort to thwart and/or retaliate against Ms. Petrova's exercise of her rights to challenge the unlawful immigration proceedings against her.**

CBP's conduct at the airport violated the law, as did Ms. Petrova's months-long immigration detention. The habeas court made a preliminary finding that:

> [T]his is both an exceptional and unusual case under *Mapp v. Reno*. Ms. Petrova has submitted compelling declarations and witness testimony that supports the conclusion that *what happened in this case was extraordinary and novel, that there does not appear to be either a factual or legal basis for the immigration officers' actions. . . .*
>
> *She has also raised a substantial question regarding whether her current detention is the product of a process that has nothing to do with the merits of this case.*

D.Vt. ECF# 11-2 at 63-64 (5/28/25 Hrg. Tr.) (emphasis added); *see also id.*, ECF# 95 (written findings). In brief, Ms. Petrova's alleged failure to declare items in luggage did not warrant the cancellation of her visa. *See* 19 U.S.C. § 1497; D.Vt. ECF# 95 at 13-14. A failure to declare items is not a ground of inadmissibility. *See* 8 U.S.C. § 1182; ECF# 95 at 27-28; *Atanackovic v. Duke*, 399 F. Supp. 3d 79, 88 (W.D.N.Y. 2019). Moreover, CBP failed to follow its own procedures or

---

[2] NYU Law School's journal, *Just Security* has tracked the number of cases in which federal courts have found that, notwithstanding "generations" of government conduct justifying a presumption of regularity, "[i]n just six months, the President of the United States may have forfeited the right to such a presumption of regularity." *Fed. Educ. Assoc. v. Trump*, No. 15-1362, ECF# 35 (D.D.C. Aug. 14, 2025) (emphasis added), *quoted in* "The 'Presumption of Regularity' in Trump Administration Litigation," available at: https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/.

issue the proper notices when it seized Ms. Petrova's research samples. *See* D.Vt. ECF# 72-1 (Declaration of U.S. Customs Expert Peter Quinter, Esq.), ¶ 8. And CBP officers are not among those authorized to revoke a visa, in any event. *See* D.Vt. ECF# 95 at 14; 8 U.S.C. § 1201(i); 22 C.F.R. § 41.122(e).

Former U.S. Customs attorney Peter Quinter told the habeas court: "Never in my 35-year career as legal counsel for the U.S. Customs Service and as a customs attorney have I seen a situation, in which someone is not even processed for a 'failure to declare' violation, and [is] then charged with smuggling in connection with the same incident three months later." D.Vt. ECF# 72-1 at 5 ¶ 8.l. The patent illegality of CBP's conduct is powerful evidence of irregularity and of the government's "stake" in preventing Ms. Petrova from (and/or retaliating against her for) asserting her rights in the habeas litigation. *Garcia*, 2025 U.S. Dist. LEXIS 196330, at *12-*13.

As the habeas court summarized:

> In her revised petition, Ms. Petrova argues that the process by which she was detained was unlawful because the immigration officer did not have authority to cancel her visa for a customs violation because she was not in fact bringing biological materials into the country as that term is defined by applicable law, because she was not given the opportunity to leave for France as she requested, and because *she has been criminally prosecuted to d[i]vest this court of habeas jurisdiction and/or to gain an advantage in a civil proceeding by prosecuting her criminally. The Court finds her petition raises substantial claims grounded in the facts and the law on which she has shown there is a likelihood she will prevail*.

D.Vt. ECF# 68 at 61 (May 28, 2025 Transcript) (emphasis added).

**2.    Ms. Petrova has made a strong preliminary showing that the criminal case was brought to retaliate against her exercise of First Amendment rights.**

The statement of the U.S. attorney, specifically calling out Ms. Petrova's *New York Times* Op/Ed in announcing the initiation of criminal charges, was highly unusual[3] and suggests that the publicity surrounding her detention and exercise of Ms. Petrova's First Amendment rights provoked, at least in part, the charging decision.

**3.    Ms. Petrova has made a strong preliminary showing that the criminal case was improperly motivated by the Trump Administration's attacks on scientists, universities, and Harvard.**

It has not been lost on the public, the scientific community, or the Commonwealth of Massachusetts, which filed an amicus brief in Ms. Petrova's habeas case, that the government's targeting of Ms. Petrova comes amidst a campaign by the Trump Administration against academics, scientists, universities, and Harvard in particular. *See, e.g., President & Fellows of Harv. Coll. v. United States HHS*, Civil Action No. 25-cv-11048-ADB, 2025 U.S. Dist. LEXIS 171326, at *116 (D. Mass. Sep. 3, 2025) ("a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI"); Com. of Mass. Amicus, D.Vt. ECF# 43-1 at 3, 7 ("[t]he Trump Administration has demonstrated a policy and practice of targeting international students and academics in Massachusetts for visa revocation and detention for nonexistent or minor offenses that are not grounds for inadmissibility"); Trim GJ at 18-19 ("When

---

[3] Local Rule 83.2.1 limits the release of information by attorneys in criminal cases and expressly prohibits comment on "the credibility of prospective witnesses" and any "opinion as to the accused's guilt or innocence as to the merits of the case or the evidence in the case." The rule permits "disclosing the nature, substance, or text of the charge, including a brief description of the offense charged" but the U.S. Attorney's comments here strayed well beyond the usual bounds of a typical press statement following arrest.

I go through border patrol, I have had several issues where I just get hassled. It's just not a wholly pleasant situation as a scientist on an immigrant visa here sometimes. From my experience, I have maybe half a dozen times where I'm asked pointed questions. For instance, are you bringing any new viruses with you this time -- by a guard? . . . It's very pointed and directed towards scientists. I've been stopped multiple times . . . [and] my baggage is taken apart because, as the guards have said, you're a scientist"); D.Vt. ECF# 72-3 at 2 (Chalfie Ltr. stating, "Many of us conducting research at universities across the country are deeply concerned about the treatment of Ms. Petrova").[4]

## II.    The Court Should Order Compliance with the Specific Defense Requests at Issue.

Ms. Petrova addresses each of the disputed discovery requests in turn, grouping them by topic where appropriate.

1.   A complete copy of Ms. Petrova's A-File (both the "left side" and the "right side").

The government states it is "unaware of any requirement … that we provide the defendant's complete A-file at this time." Ex. B at 1. But the A-file is plainly *material* in a case, such as this one, that involves immigration and border-crossing facts and issues. Indeed, since the A-file is commonly produced by the government at the initial appearance in mine-run illegal reentry

---

[4] *See also, e.g.,* Bender et al., "Inside Trump's Pressure Campaign on Universities: The opaque process, part of a strategy by conservatives to realign the liberal tilt of elite universities, has upended higher education," *NY Times* (Apr. 14, 2025), available at https://www.nytimes.com/2025/04/14/us/politics/trump-pressure-universities.html; Tucker et al., "A judge temporarily halted DHS's ban on Harvard's ability to enroll international students. Here's what to know," *CNN US* (May 23, 2025) (discussing DHS' attack on Harvard's ability to enroll international students, enjoined by this District), available at https://www.cnn.com/2025/05/22/us/international-students-harvard-trump-administration; Rose, "Attacks on Harvard by Trump administration have built for months. A timeline of the dispute," *CNN US* (Sept. 30, 2025), available at https://www.cnn.com/2025/04/26/us/harvard-university-trump-timeline (discussing Trump's attack campaign against Harvard).

prosecutions, the government's unwillingness to produce Ms. Petrova's A-file here is especially perplexing. Such an unexplained departure from common practice is not entitled to any presumption of government regularity. And while Ms. Petrova could separately seek by right to obtain a copy of her A-file by FOIA request, the likely processing delays would interfere with orderly progress of this criminal case. Thus, the government's refusal to produce this requested material serves only to waste government resources and risk further delay.

2.  The six reports and eight images referenced on page 2 of ROI BO07WE25BO0001-002:

1. SI_176209348_BAG_Redacted
2. IncidentLogReport-Redacted
3. SI_176209348_AGR_Redacted
4. SI_176209348_ADM_Redacted
5. PETROVA closeout_Redacted
6. Incident-Redacted

1. IMG 1
2. IMG 2
3. IMG 3
4. IMG 4
5. IMG 5
6. previewDocument
7. previewDocument (1)
8. previewDocument (2)

3.  The Report of Investigation identified as ROI BO07WE25BO0001-005.

4.  The HSI National Security Division "subject report" referenced in and "linked to" ROI BO07WE25BO0001-003.

With regard to request #2, the government identified the Bates ranges of reports 1 and 3 and images 1-8 in the discovery it has already produced. Ex. B at 2. As for the other materials identified in these requests, however, the government neither produced them nor explained the basis for its refusal to do so. There requested reports, which are plainly material since they all relate to this case, specifically, should be produced.

5.  Any and all video or audio recordings and depictions of Ms. Petrova's movements, interactions, and/or statements at Logan Airport in the Customs/baggage areas, Secondary Inspection, and detention.

The government produced a large volume of audio-video recordings in response to this request. Some of the audio contradicts reports concerning oral interactions between Ms. Petrova and CBP personnel. But notably, *none of the audio-video materials produced document the alleged interaction between Ms. Petrova and the CBP Agricultural Specialist in which she allegedly made the false statement charged in Count Two of the indictment*. The government should be required to confirm whether audio-visual recordings of that charged interaction exist, and, if they do, produce them.

6. All documents and video or audio recordings concerning or comprising the purported canine alert to Ms. Petrova's luggage.

7. All documents and photographs concerning the food products allegedly found in Ms. Petrova's luggage, and their disposition.

In its response these requests, the government pointed to a produced report stating that "K9 Plato…alerted to PETROVAs yellow duffel bag on the carousel prior to retrieval" and that "3 lemons, 3 oranges, and .5 kg each of beef and pork meat products were found and seized by CBPAS." The government did not otherwise respond to the requests, and the extensive video evidence it produced from the baggage/customs area does not appear to depict the alleged K9 alert, nor does any of the video or photographic evidence produced appear to depict the food items. To the extent other responsive materials exist, the government should be required to locate and produce them.

8. Documents that identify the precise time at which Ms. Petrova was "called on the loud speaker," as described in SA Goldsworthy's testimony (Tr. at 16).

The government did not specifically address this request and has not produced responsive documents or information. At the probable cause hearing, the government implied that Ms.

Petrova's alleged failure to respond to the calling of her name on the loudspeaker, which required agents to search for and find her using a photograph, was suspicious or probative of her malign intent. *See* Ex. D at 16.  For that reason, the defense has requested documentation of the precise time at which the supposed call went over the loudspeaker, which we expect to demonstrate that Ms. Petrova was still in line for primary inspection (passport control) at the time and thus would not have heard the call over loud speakers in the baggage/customs area, which is in a different section of the terminal.

10. Any Notice of Seizure concerning items taken from Ms. Petrova by CBP, including without limitation any food products and the alleged "biological materials."

When the CBP officer seized Ms. Petrova's research samples and alleged food products, the officer was required to "refer the matter to the nearest CBP Fines, Penalties, and Forfeitures Office, which would issue a formal Notice of Seizure." D.Vt. ECF# 72-1 ¶ 8 (Quinter Decl.). No such notice has been produced, and the government's letter does not respond to this request. If no Notice of Seizure was issued, the government should so state in writing.

12. All reports of examinations and tests, including workpapers, notes, images, and communications comprising or describing such examinations and tests, of the alleged "biological materials" seized from Ms. Petrova, including without limitation any materials that concern or comprise the factual and legal basis for Dr. Robert Bull's "observation," described in a single sentence of the government's letter dated July 25, 2025, that "the frog embryos are biological materials" and/or his statements to SA Goldsworthy or any other agent conveying a similar conclusion.

In response to this request, the government stated that it "previously disclosed information pursuant to Fed. R. Crim. P. 16(a)(1)(F) (Reports of examinations and tests) in its July 25, 2025 automatic discovery letter," and that it would be premature to disclose expert reports under Fed. R. Crim. P. 16(a)(1)(G).  Ex. B at 2.  To be clear, the defense is not seeking early "testifying expert" disclosures. But beyond the bare statement in a single sentence of the government's

automatic discovery letter, the government has produced *nothing* in the nature of reports, examinations, or tests as required under Rule 16(a)(1)(F). It strains credulity that a government scientist tasked with assessing the factual basis for a criminal charge of unlawfully smuggling "biological materials" would create no notes, workpapers, or written communications in the course of performing that work or reaching a conclusion about whether, in fact, the inert samples at issue constituted "biological materials."

16. All documents concerning or comprising the "referral" form HSI Domestic Operations Headquarters that caused SA Goldsworthy to open the investigation of Ms. Petrova,

   including, without limitation, emails, texts, and instant messages between or among HSI and other government personnel, including Secretary Noem and White House personnel.

17. All documents and communications that could support an inference that the decisions to initiate criminal investigation and/or prosecution of Ms. Petrova resulted from her exercise of constitutional and/or statutory rights, including without limitation her commencement of the civil action, No. 2:25-cv-00240-cr (D. Vt.), her request for bail while in immigration custody, her application for political asylum, and/or public statements she made concerning her detention.

18. A list of all federal cases in the last 10 years, in this district and nationally, in which a defendant was charged with an offense under 18 U.S.C. § 545, including the name of the defendant and the docket number.

19. A list of all federal cases in the last 10 years, in this district and nationally, in which a defendant was charged with an offense under 18 U.S.C. § 1001 arising from a statement made to U.S. Customs and Border Protection at a port of entry.

20. Data for the last 10 years, in this district and nationally, concerning instances when suspected "biological materials" were seized at a port of entry, including the date of the seizure, description of the material seized, and whether criminal charges were brought.

21. Documents and data concerning or concerning the monthly quantity (by weight or volume or other measure) of food products seized and/or confiscated by CBP at Logan Airport during the last year.

In response to request 17, specifically, the government states that it is "unaware of any such documents or communications." Ex. B. at 2. But the government has not stated whether it has made inquiry, in particular at DHS/HSI headquarters, to ascertain whether responsive materials

exist.  As to the other requests, the government states that it is "unaware of any requirement that we produce such information or compile the data you request." Ex. B at 2.  However, all of this information is relevant to Ms. Petrova's anticipated dispositive motion asserting vindictive/selective prosecution, for which she has made the necessary showing to justify discovery, as discussed above. Thus, to the extent that responsive materials or information are within the government's possession, custody, or control, it should be ordered to collect that material and produce it to Ms. Petrova.

22. Information (regardless of whether or not previously reduced to writing by the government) concerning or comprising exculpatory statements made or information provided by Will Trim during any meeting with prosecutor(s) and agent(s), including the meeting prior to his grand jury testimony on June 12, 2025.

In response to this request the government states that "[d]uring the brief meeting with Trim and his attorneys, Trim made non-exculpatory statements that he repeated in sum and substance before the grand jury," pointing to various statements in the grand jury transcript. However, undersigned counsel understand that Mr. Trim made additional statements in the "pre-meeting" that were not repeated in the grand jury, including a statement that lab members including Ms. Petrova had *not* discussed prior to her trip whether it was necessary to declare lab samples, and that lab personnel did not know (or believe) it was necessary to declare inert samples upon entry.

In addition, during his grand jury testimony, the government prevented Mr. Trim from answering certain questions that would have conveyed exculpatory information to the grand jury that he had previously provided to prosecutors and the agent. For example, Mr. Trim was not permitted to explain the context of a regulation that had been discussed in a text exchange with Dr. Peshkin, who was Mr. Petrova's and Mr. Trim's boss:

> Q.     Okay. So do you recall what is written here, being said? That is, do you know if (indiscernible 0:02:58, Track 1005) always do. I'll say Ms. Petrova for the record -- must declare the embryos on the way into the United States. And

then there was a response. I don't know, to be honest. In the link I sent you, it was
something you may need to declare.

A.       Yes.

Q.       And you have that regulation written on the container, but I can't be
certain as it was a while ago I read it.

A.       Yes.

Q.       Is what I just read that started with I don't know, to be honest, your
statement?

A.       That's my message, yes.

Q.       Thank you.

A.       Am I allowed to say anything about that?

Q.       Not until I ask a question, no.

MS. PELLEGRINI: I have no further questions for Mr. Trim. Do any of the grand
jurors have any questions for him?

THE WITNESS: So am I allowed to say anything
about that? Because --

BY MS. PELLEGRINI:

Q.       No.      This isn't a court --

A.       -- that's taken very out of context.

Q.       The grand jury is question and answer.

A.       Okay.

Q.       Not a declaration.

Trim GJ at 23-24.  In addition, Mr. Trim was not permitted to answer questions from a Grand Juror

about his awareness of  applicable regulations:

GRAND JUROR: And is there any regulation to import or export these things?

MS. PELLEGRINI:    I don't believe he's going to have the ability to answer that
question, sir. I --

GRAND JUROR: And if they do that, they need to know that.

MS. PELLEGRINI: Right, exactly. But I think the question is about is there any
regulation should come from a person with familiarity with the regulations such
as a special agent from Homeland Security Investigations or an agent from
Customs and Border Protection.

THE WITNESS: Well, if I can say something?

BY MS. PELLEGRINI:

Q.       Are you going to say --

A.       It'' --

Q.       -- that you're familiar with the regulations?

A.       Yes.

Q.       Are you going to say that you're a lawyer?

A.       Well, no. Of course not.

Q.       Are you going to say that you applied them to the situation?

A.       I understand. You're not going to let me speak.

Q.       Right.

Trim GJ at 28-29.

Accordingly, the government should be required to disclose the substance of Mr. Trim's statements in the pre-meeting, whether or not prosecutors or agents wrote reports or took contemporaneous notes.

24. The legal instructions provided to the grand jury that issued the indictment in this case.

The government declined to produce these materials. *See* Ex. B. at 3. Although grand jury witness *testimony* is generally protected from disclosure under Fed. R. Crim. P. 6 (unless subject to a particular disclosure requirement under, for example, *Brady v. Maryland* or the *Jencks* Act), the prosecution's *instructions* to the grand jury are different, and should be disclosed without any showing of particularized need. *See, e.g., United States v. Alter*, 482 F.2d 1016, 1028 n.20 (9th Cir. 1973) ("proceedings before the grand jury are secret, [] the ground rules by which the grand jury conducts those proceedings are not."). As Judge Burroughs explained,

> [T]he Court sees no reason why the prosecutors' instructions to the grand jury should be kept secret. What a prosecutor says to the grand jurors before asking them to return an indictment does not compromise the interests sought to be protected by grand jury secrecy. Further, allowing the instructions to be disclosed through the discovery process would help ensure the integrity of the grand jury process, incentivize prosecutors to be careful in instructing a grand jury, and give some teeth to the grand jury's "shield" function. *See United States v. Mandujano*, 425 U.S. 564, 573 (1976). It would also alert defense counsel to the possibility of an irregularity that could warrant a review of the grand jury process in a particular case. Given the length of time that it takes a case to get to trial, the stigma and harm done to a defendant simply by virtue of being indicted, even if later acquitted, and the largely unfettered power of the grand jury, the small step of allowing a defendant some visibility into the legal instructions given to the grand jury would help protect the defendant's rights, while fully maintaining the secrecy that is so fundamental to the functioning of our grand jury system.

*Facteau*, 2016 U.S. Dist. LEXIS 111595, at *15; *accord United States v. Gurry*, No. 16-cr-10343-ADB, 2019 U.S. Dist. LEXIS 8212, at *7 & n.1 (D. Mass. Jan. 17, 2019); *United States v. Fuentes*, 2008 U.S. Dist. LEXIS 50425, at *10 (E.D. Cal. June 24, 2008) ("defendants are entitled to the

22

transcript of the instructions and charges to the grand jury [without a showing of particularized need]"); *United States v. Belton*, No. 14-cr-00030-JST, 2015 U.S. Dist. LEXIS 52426, at *8-*9 (N.D. Cal. Apr. 21, 2015); *In re Grand Jury Proceedings*, 813 F. Supp. 1451, 1469-70 (D. Colo. 1993) (releasing grand jury instructions as a ministerial record).

Moreover, even if a showing of particularized need is required to warrant disclosure (it is not), the circumstances here would support disclosure. This has been a prosecution in search of a crime from the start. The timing of the charges and the United States Attorney's statement suggest improper motive and animus. An experienced HSI agent at the probable cause hearing could not define "biological materials" or "merchandise" or explain any limitations on declaration requirements. Mr. Trim was not allowed to provide clarifying testimony. All of these circumstances support disclosure, at a minimum, of the legal instructions given to the grand jury concerning the elements of the charged offenses, applicable mens rea, and definitions of key terms.

25. All documents and information concerning or comprising i) any written guidance provided in hand to Ms. Petrova; and/or ii) any guidance visible or audible to Ms. Petrova upon her arrival Logan Airport on February 16, 2025, describing any obligation to declare items brought into the United States. Without limitation, we request documentation, still images, and recordings of the "signage at the airport" and "television screen that rotate a message," described by SA Goldsworthy at the probable cause hearing (Tr. at 9) at that would have been visible to Ms. Petrova upon her arrival on February 16, 2025.

26. All documents and information concerning or comprising i) any written guidance provided in hand to Ms. Petrova; and/or ii) any guidance that would have been visible or audible to Ms. Petrova upon her arrival Logan Airport on February 16, 2025, concerning any definition of "biological materials" and/or regulations of their importation into the United States.

At the probable cause hearing, the government's witness testified that individuals entering the U.S. are "made aware of the declaration requirement" by "signage at the airport" in "multiple locations" as well as "television screens that rotate a message about the Customs process." Ex. D at 9. All three counts in the Indictment have heightened mens rea requirements. The false statement

and concealment charges require the government to prove Ms. Petrova acted "knowingly and willfully," and the smuggling charge requires a "fraudulent[] and knowing[]" mens rea. Accordingly, the information available to Ms. Petrova to inform her of what she needed to declare, and/or what constitutes "biological materials," are highly relevant. Moreover, given that English is her second language and the secondary inspection interview was aggressive and confrontational, the information available to Ms. Petrova concerning this terminology is especially important. The government did not address these requests in its letter and should be required to produce the materials.

27. All written policies or procedures concerning border inspection of travelers by CBP, including without limitation policies and procedures concerning the definitions, inspection, seizure, and disposition of food products, agricultural materials, and biological materials.

28. All written policies or procedures concerning or comprising guidance to CBP concerning whether, how, and when to refer incidents and/or border seizures for criminal prosecution.

29. The policies, procedures, and protocols governing CBP canines and handlers at Logan Airport, along with documents concerning or comprising the certification and training of the canine that allegedly alerted to Ms. Petrova's luggage.

In response to these requests, the government states that it is "unaware of any requirement under Fed. R. Crim. P. 16 or otherwise that we produce CBP's internal regulations or guidance at this time." Ex. B at 3. However, the policies governing both the government's actions at the airport and its actions in referring the case for prosecution are relevant to whether its treatment of Ms. Petrova was consistent with those policies. If the government violated its own policies, that evidence would support Ms. Petrova's claims of selective and vindictive prosecution. See *United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972) ("Since no valid basis for the selection of defendants was ever presented, the only plausible explanation on this record is the one urged by Steele"). Where Ms. Petrova has made a prima facie showing that she has been singled out for

24

irregular and discriminatory treatment, the Court should afford discovery into "the government's prosecutorial decisions." *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001). When such "discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim." *Armstrong*, 517 U.S. at 468.

Moreover, if Ms. Petrova is being criminally charged with violating a regulation that purports to require individuals to declare "*[a]ll* articles brought into the United States," 19 C.F.R. § 148.11 (emphasis added), how does the government choose which articles to confiscate and whom to prosecute? The policies are relevant to the question of whether there are any objective standards to guide its discretion, in an otherwise seemingly limitless sea of violations of this regulation. *Cf.* Ex. D at 49 (cross-examination of HSI Agent: "Q. [I]f I, for example, as an American buy like an Eiffel Tower magnet at Charles de Gaulle airport and bring it back, have I committed the crime of felony smuggling if I don't declare that?. . . A. There's personal exceptions [as far as written versus oral declaration] based on a dollar value, but you are required to declare all items that you acquired abroad.") (emphasis added); *see Kolender v. Lawson,* 461 U.S. 352, 357 (1983) ("a penal statute [must] define the criminal offense with sufficient definiteness . . . and in a manner that does not encourage arbitrary and discriminatory enforcement"); *United States v. Morosco*, 822 F.3d 1, 5 (1st Cir. 2016) ("a law is unconstitutionally vague if it fails to give ordinary people fair notice of what is forbidden, or if it fails to give the designated enforcers (police, prosecutors, judges, and juries) explicit standards (thus creating a risk of arbitrary enforcement)").

## Conclusion

For these reasons, the Court should order the government to provide the requested discovery.

Respectfully submitted,

**KSENIIA PETROVA**

By her attorneys,

*/s/ William W. Fick*
William W. Fick, Esq. (BBO# 650562)
Daniel N. Marx, Esq. (BBO# 674523)
Amy Barsky, Esq.
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM
ABARSKY@FICKMARX.COM

## LOCAL RULE 7.1 CERTIFICATION

Undersigned counsel certifies that counsel for both parties conferred by telephone and determined that it was unlikely either party would deviate from the positions taken in their respective discovery letters and that the disagreements would therefore require Court adjudication. Should the parties further narrow areas of dispute in the process of litigating this motion, they will advise the court prior to the hearing.

/s/ William W. Fick

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 19, 2025.

*/s/ William W. Fick*